Association and Mr. Ferguson, when you're ready. May it please the court, my name is Charles Ferguson and I represent the appellants in this Fair Housing Act dispute and with me in the courtroom today is also Appellant Jacob Scoggins. Our appeal presents the following issues. They are whether the district court erred in granting summary judgment in favor of the appellees, when the appellants demonstrated that an accommodation request was both necessary and reasonable as a matter of law, whether the district court erred in granting summary judgment in favor of the appellees, when the appellants proved that the modification request was necessary as a matter of law, and also erring and dismissing defendant merit and not holding him individually liable. It's probably not helpful to couch it that way, it's probably better to couch it in terms of the ramp and then the use of the roads. I understand, your honor. The ATV request would be the use of the roads and the ramp would be the modification request and I'd like to begin with the ATV request for the roads and there are three arguments that we have on that. The first have to do with two elements, the necessary element and also the element of reasonableness and then there is the final issue of the constructive denial, which is an issue that I'd like to address first. It's undisputed that on May the 9th, Debbie Scoggins sent an email to the property manager and to the association requesting the use of an ATV for her son Jacob to use in traveling the roads of Lee's Crossing to visit friends and also specifically to work for a neighbor who had employed him. The day after the email was generated making the request, defendant merit sent out an email to the voice of dissent in opposing the request and I quote, without discussion or deliberation. Scoggins waited to hear back from the association about the request. There were two board meetings, one occurred in July of 2009, the other occurred in September 17th, 2009. The first board meeting was held by a quorum, not everybody was present and no one took any action, but more importantly there's no evidence the whole time that has ever been presented that indicates that anybody told the Scoggins about the fact that their request was going to be addressed to either one of these board meetings. Between July and September, the board took no additional action to gather any information or gather any facts about the request, about Mr. Scoggins' disability, about the type of ATV he wanted to use and when they came together on 17th, the record evidence suggests that they hadn't gathered the information, they weren't prepared to make a decision any more than they were during the previous board meeting and there is testimony in the record from three independent witnesses that suggest that the merits were opposed to the request from the outset and moved to deny the request without having any information. Where it was left in the influence by further information, their concerns I guess were safety considerations, the roads had a speed limit and the idea of traffic there and liability and actually some laws too that we're worried about. That's correct, Your Honor. I'm not sure that that's a circumstance where they would have needed more particular information. Did they ever communicate those reasons to the Scoggins? There is no evidence in the record to suggest that there was ever any communication. Not an email, not a letter, all of these individuals. How did the Scoggins learn that they weren't allowed to use the ATV on the public roads there? Prior to the time, prior to the time, prior to them sending out a second request, they had incrementally learned from neighbors that they had ran into who attended the board meetings what the outcome was and what the discourse was during the board meeting. But more importantly, Your Honor, the Fair Housing Act requires some sort of deliberation. Whether you intend to deny a request or whether you intend to approve it, there needs to be some deliberation and interaction and that that burden falls on the provider, not the requester. Now the manufacturer though warned specifically, did not in capital letters, this is for off-road use only? That is correct. What significance does that have in our analysis? Why doesn't that weigh heavily on the reasonableness of the request? I don't think it weighs heavily, Your Honor, because the the use of the ATV was going to be on private roads. There's still cars on that road, right? That's correct, but it's more dangerous to be on the road with cars when you're operating a vehicle. Plaintiff has attempted to do in the past. Just because you're less dangerous doesn't mean that you aren't still dangerous, does it? Well, we believe there's demonstrative evidence in the record that shows his ability to use the ATV very safely. He has the ability to do it, he has the strength to do it. Isn't it though also the other car's ability to see him? Isn't that part of the issue? The ATV would actually make that issue better for our young man because he'd be more visible. The other apparatuses place him lower to the ground and out of sight. The ATV would actually raise his level. Other vehicles would be able to see him a lot easier on the road. You're saying easier than in a motorized wheelchair? Correct, or a manual wheelchair or a tricycle for that matter. Was he allowed to use those on the roads? That's the other issue, Your Honor. It's not easy to do those. They cause excessive... I'm asking, would he be allowed to? It seems to me those should be excluded from the roads too. That's never been made an issue in this case as far as whether he was allowed or not allowed to do that, but... Did the record show what the speeds of the ATV, this range of speed, maximum range? I don't recall what the maximum speed is on the ATV, Your Honor. I do believe the speed limit in the roads there is 30 miles an hour, but the safety is an issue that they put forward and they retained an expert in this case. The expert in this case is not a physician. He's not a rehab specialist. He is an engineer who I believe is involved in crash impact. He doesn't have any intimate knowledge of Mr. Scoggins' abilities. He's never observed him operate the ATV. We have record in the evidence, evidence in the record, excuse me, that indicates that Mr. Scoggins was given training on how to operate the ATV. His father testified... Was that the issue? I didn't think that was the issue at all. I didn't think it related to his operation or he in particular. I think it related to the use of ATVs on the roads. Well, that's what they say. Then should we assess whether that's reasonable? That's the argument, Your Honor, and it's not reasonable because the covenants themselves specifically allow for the petition to use an ATV by any homeowner there, and that still exists in their covenants. You're saying on the covenants for lease crossing specifically allow a homeowner to petition for the use of an ATV on their roads, and it's subject to a nuisance analysis. Now one of the concerns they had was that the ATV would spook horses, but we've shown that their own employees use off-road vehicles and motorcycles, which certainly create a higher level of noise, would spook horses. And they're not prohibited in the lease crossing community. So their reasonableness argument to me seems to be unreasonable, for lack of a better word. And then as far as the necessary element demonstrated... Does Virginia law prohibit the use of ATVs on public roads? On public roads. I understand, but is that what it's prohibited? Yes, Your Honor, that's correct. That's correct. Can you tell me where in the record you have a final decision from the Homeowners Association on either one of these matters? On the ATV request? On the ATV or the other? The ATV request, there is no final decision. Uh-huh, and what about the other request? In fact, that's what they maintain, that they've never made it, they've never denied the request. Well, if that is so, then how is this case ripe? It's ripe because a constructive denial can take place... No, no, no, no, no, no. Okay, show me the evidence of the constructive denial. Well, Your Honor, nobody's ever contacted them. They put a request in... When did they put the request in? May of 2009. Okay, what about the other? You have two... You're dealing with the ATV and the... What was the other thing they want? The outdoor ramp. Okay, the outdoor ramp has a history behind it. Well, when was the request, I know there is conflicting evidence about there being an oral request, but when was the first written request? The first written request, I believe, was in August of 2010. August of 2010, when did you file this lawsuit? Correct. When did you file the lawsuit? The lawsuit was filed in September, I believe. And there had been no denial? There was a letter denying the request. Denying it from the Homeowners Association? Correct. Actually, it's not... They said they needed more information, they didn't deny it. It's... Well, it is a denial if you look at what's required and not required by the Fair Housing Regulations and also the Joint... They wanted more information. There was a drawing with a little C-line around the front scoop, and that's all that was provided, and they wanted some... There was information, and they left it, clearly left it open for resubmission of more detail. I think a fair reading of that letter would indicate that... Okay, would you have the JA's site for the letter? We could look at it together. I'm sorry, Your Honor. Do you have the Joint Appendix site for the letter? We could look at it together. I do not, Your Honor. Okay. Go ahead. But the letter imposes conditions that the regulations suggest and also the joint statements suggest are not required. And some of the information that the letter asked for could have easily been provided after an architect or a contractor was involved and commissioned to construct the ramp. That's essentially not something that needed to be provided at the very beginning. The regulations require that it be a reasonable description. They also advised in their letter that they'd be building the ramp in accordance with the color and the materials that they used to build the home. Okay, is the letter that you're talking about in this case regarding the ramp, the letter from the homeowners association... It's actually from the... Excuse me, the letter that appears at 2053 of the appendix dated October 18th, 2010? Yes, I believe that's correct, Your Honor. That letter says, due to numerous missing items in the application, unfortunately, we were unable to process. Please submit the following. And then they list several things and says, please review this letter carefully. Then they say this application is denied as incomplete and we're unable to process at this time. Above is a list of items currently missing. Please recheck your application. And that's what you're relying on to say that it was a final denial. Well, Your Honor, I see that I'm almost out of time here. If I may answer the question, you can't look at it just based on the letter alone. You have to look at it in the total context, the history that's gone on, the way they were treated. We have one written submission. But we have an ATV request that was... No, no, I'm talking about the ramp. We have one written submission which has that little drawing on it with a cover letter. And we have this... There's also a scale. Pardon me? There's also a scale, I believe, as well, Your Honor. What are you talking about? That demonstrates the size that the ramp would be. Where's that? It should be in the attachment. I see a layout of the house. I'm looking at 2039. There's a layout of the house and there's a handwritten C drawn on the side of the thing. It just goes... Showing where the location's going to be? And there should be... No dimensions, no size. There should be a scale on there that denotes one inch is 20 feet, I believe. That's for the drawing of the house. Well, it also would show the size of the ramp as well. Take a look at that with me, 2039. I don't have it with me, Your Honor. You don't have the joint appendix with you in court? I don't, Your Honor. Okay. Well, you know, when you come to argue a case, you should have the record and you should be able to point to any part of the record you rely on to help us. That helps the argument. I understand. I can suggest to you that this is a hand-drawn C-shape, L-channel shape, and it says ramp. And it's drawn on a location survey of the house. And the response... And then you have that cover letter which gives what you recited. And the response basically says, provide us more information as well, determine whether you need a building permit, and assure us that that's okay. I submit if you go ahead and follow through with that, you may well get it. That's a possibility, Your Honor, but based on the history that's occurred? Now, the history... It's pretty short with respect to this. It's a pretty short history. There was a discussion earlier, years before, about putting a ramp up. And the person they spoke to sort of put a halt to that and say, oh, I'm not sure you can do that. And so, why don't you put it in the garage? And they put it in the garage. That's one incident. The first incident was to build out on the back when they were building the house. Now, that, as far as I know, is the history of the ramp. Then, years later, they submitted this ramp in writing with that one letter and that drawing. And the response is, we need more information before we can process it. And they actually did a little more, too, because at the end of the letter, it says, please note that this is not a substantive denial of a request for a second ramp. It merely requires you to provide a complete application so we can properly determine what you wish to construct. So, they're being really clear. They're inviting the Scoggins to give them the information they need. They're saying, we're not turning you down by this letter. We're just saying you've got to give us more. But it wasn't their interpretation that they were inviting more information. Well, that's just what they said in the letter. I just read you Mr. Merritt's letter. Well, but again, I go back to the history and what's occurred between the parties. In 2003, they verbally made a request. Oh, that's, when was this? This was 2010? This is 2010. Seven years before. Correct. And they had that oral conversation which led to the building of the ramp in the garage. Yes, it did. Okay, now that's hardly relevant to their seven year later request for a ramp where they submit a letter. Well, there were more requests, Your Honor. There were verbal requests again from Mrs. Scoggins. And in both cases, Mr. Merritt summarily rejected the request. Doesn't she have to submit a letter? I mean, you're going before a board. You've got to have something in writing. I think the initial request can be done verbally. I don't think it has to be conducted in writing. They can meet and have discussion. That's something they're free to do. But that's not something that's ever really happened in this case, up until the letter that you're looking at. All right. You've got six minutes on rebuttal. We'll have you back. Thank you, Your Honor. Mr. Dingman. Good morning. May it please the court, Michael Dingman of Reed Smith for the Apple Ease Lease Crossing Homeowners Association and Jack Merritt. With me is Richard Kelly of Bean, Kenny, and Corman. I believe the court has focused on what is the predicate issue in determining whether... Well, let me go back to the ATV. Sure. Did the board deny the ATV? No, sir, they did not. There was actually a written request dated August 26, 2010, with respect to the ATV. John Bennett... Didn't Mrs. Scoggins say that they requested it in writing? And don't they have a writing at some time before that? You know, a certain period go by and you do have a constructive denial, I think. There was an email from Mrs. Scoggins to the manager in May of 2009. There was then discussion of that email at a board meeting. And the testimony of the manager, Mike Arntz, is that he was instructed to send an email to the Scoggins requesting information, and that he did that. But they say they didn't get that. There's a dispute in the record. They claim that they did not receive that email. He claims that he sent it. Does he have a copy of the email? Yes. It's in the record? It's in the record. Where is that? I'll have to provide that for the court. I thought I had it here in my notes. Okay. There was evidence in the record concerning the use of the ATV by other people, use of ATVs by other people in Lee's Crossing. No, there's no evidence of any use of the ATV by others. Because your opposing counsel was referring to use for maintenance. Is there anything in the record that addresses that? And where might that be? No, there was an allegation made by the Scoggins that not members of the association, but people hired to perform maintenance work on the roads, for example, use some vehicle similar to an ATV, but there was no evidence in the record of that. And their representation was these were, again, third parties hired to come out and perform maintenance work. There is a provision in the covenants that allows for a member of the association to petition for the use of an unlicensed vehicle. And that was the provision that Mr. Ferguson was referring to. But there is no evidence in the record that there's ever been a request by any other member of the association to use an ATV, or that that type of request has ever been approved. To finish the discussion on the ATV, with respect to the request that was made in May of 2009, the evidence shows, and Mr. Ferguson alluded to this in his argument, that the Scoggins were aware that their request was being discussed. So whether they actually received the email from Mr. Arndt or not, they were certainly aware that they had submitted an application. They were told by their neighbors that their application was being discussed. The dates for the board meetings are posted on the website. The agenda is posted on the website. There is no evidence in the record that they followed up with anyone to find out what was the status of that request. Until August 26, 2010, when they filed a written request to the board asking for the use of the ATV. At that time, John Bennett contacted them. Mr. Bennett was a member of the association's board of directors and requested information from them regarding the ATV, which they refused to provide. That was the end of the process. So there was no denial of the request for the ATV. The thing I don't guess I understand about your brief is if, in fact, there has been no denial, then I don't see how we have jurisdiction. But you don't argue that. I mean, don't we have to send it back to the district court and have it dismiss the case without prejudice? Well, the district court found as a matter of law that there was no denial of either the ATV request or the request. That seems to me to get you to a situation which is not ripe for review, not to a situation where you win the judgment. Well, I believe that that means it's not right for review. I don't disagree with that. And the court found that it was not right for review. Without prejudice? Well, I do not believe the court should dismiss without prejudice. Why not? Because we don't have a final... If we don't have... You understand the concept of jurisdiction. I mean, I can tell you're a sophisticated lawyer from a big law firm. If we have no jurisdiction, we can't make a merits determination. Well, I understand that. But the court did consider the record with respect to the reasonableness of... As you argue, there's no final decision. There is no final decision, but there was a presentation of the rationale for these requests. So you're saying the court treated it as a constructive denial? Does that appear in the record anywhere that the judge said, I'm treating this as a constructive denial? No, it does not. And you don't even claim it's a constructive denial. Whether would you claim just the reverse? There's no denial. Yes. So the court, I agree, should not have considered the arguments with respect to whether it was reasonable or necessary. But having done so and created a record, I believe this court can find that it was not right, but also that the requests were neither reasonable nor necessary. With respect to the ramp, I just want to address a couple of the timing issues. The request was made in writing on September 20, 2010. Mr. Bennett contacted the Skagans on September 22, 2010, asking for information. They refused to meet with him. They refused to provide the information. They filed their lawsuit on October 13, 2010, before the October 18, 2010 letter had been sent out. And as the court has quoted from that letter, it was clearly not a denial. Okay. Do you tell me the date of the letter or the email that you say some representative of your group sent in response to Ms. Skagans' letter or email about the ATV? I believe that was in July of 2009. That's why it's really, you know, you guys have been living with this record. It's a big record. It's really helpful if you know where these things are. I understand, Your Honor. I thought I had that written down, but I did not. Well, your brief doesn't refer to it either. I'm looking at it. Similarly, in response to the Skagans' ATV request dated August 26, 2010, John Bennett sent an email to Skagans in September asking them for more information. No response was ever received. I have that, but that is, I thought, we're talking about a 2009 email from Ms. Skagans. And so the 2010 letter in September doesn't strike me as a prompt response, but you said there was another response in July 2009, and that's what I'm looking for. Now that I'm looking at the record, I believe there was an email from Mr. Arndt to Mr. Beckwith regarding sending the email to the Skagans. Uh-huh. 2146 is what it says in the, I don't know if that's true because everything is, the numbers are not, sometimes don't give you the page you want. But that's what the index says. See if 2146 has it. Okay. This is a draft of the email that Mr. Arndt proposed to send to the Skagans, and he asked for input from the board members. Oh, so we don't know if he did send it. Well, he testified that he did send it. But he doesn't have a copy of what he did send. That's correct. We would have saved a lot of time if you told me that at the outset. I'm sorry, I was confused with the draft email that he sent to the board. Which is at 2147. Correct. In his testimony, Mr. Arndt's testimony was that he did in fact send that email to the Skagans. They of course claim that they did not receive it, so there is a fact dispute. Doesn't his email machine have the capacity to bring up what was sent? My email machine, which I bet isn't cutting edge. You would think, Your Honor, and we certainly hope that Mr. Arndt had saved that email, but we were not able to recover that. That sort of indicates he didn't send it, doesn't it? Well, his testimony was clear that he did send it. Well, he has this draft. He must have had to retrieve that from sent messages, too. I understand. And there's no explanation as to why we could not find that email from him. There was evidence, nonetheless, that the Skagans were aware that this issue was being discussed by the board because they were told this by their neighbors, as Mr. Ferguson pointed out. They made no effort to contact the board We're on the same page. I'm going to whether we have a constructive denial here or not. And if she asked for this in 2009 and she doesn't get a response until the fall of 2011 because she never gets a draft email, then I think she's a pretty good argument there has been a constructive denial, don't you? Well, the next request and the request that's at issue in this case was the written request of August 26, 2010. Well, but you acknowledge that she made a written request in 2009. How many requests does she have to make? She made a written request in May of 2009 to the manager and the board instructed the manager to contact the Skagans to obtain information. They believe that that had been done. Obviously, there was a miscommunication between Mr. Arndt and the Skagans. But it seems to me it's incumbent upon the Skagans, especially when they know that it's being discussed at board meetings to take some affirmative step to either contact the manager or the board or come to a board meeting and ask what is it that you want to know about our ATV request? And they didn't engage in any of that. Let's just hypothesize that what they say is true. That she, because I think for purposes here, we've got to, right? That she sent the email in 2009 and she gets no response until she sends another email in 2010. But she's told in the interim, Your Honor, that the board is considering her request. That's what she's supposed to do is rely on, and she gets no official. I understand that, but she knows, the Skagans know that the board is considering and asking for information. Now, maybe Mr. Arndt and Mrs. Skagans never communicated, but they were aware that their request was being considered by the board. It seems to me that they had an obligation to come forward and ask or clarify what is it that you're considering and what do you need from us? When they came forward with a written request directly to the board in August of 2010, there was a prompt response from Mr. Bennett. Where's the 2010 request on the ATV? You happen to know where that is? This record is organized very difficult to find things because they're linked up to various parties' positions as opposed to some order to find them. I apologize, I cannot find that reference in my notes. Well, there's an August 26th, is that the date? Yes, August 26th, 2010. Bottom right, it's impossible. Yeah, 1205. That request was promptly responded to within a matter of a couple of minutes. But this is the one you're talking about?  That's what you want to establish first? Yes. All right, so she basically recognizes that it's being discussed, but she says you're ignoring them basically, it's getting long. I'm now making another request. Right. And what was the response to that August 26th? John Bennett, who was a board member and had been a liaison between the board and the Scoggins for several years, contacted them at the same time he had contacted them regarding the ramp request to ask for additional information with respect to the ATV. Where is that letter in the JA? I'm sorry? Where is that in the JA? It wasn't by letter, Mr. Bennett testified in his deposition that he contacted Mrs. Scoggins. And Mrs. Scoggins testified that she was in fact contacted by Mr. Bennett, but believed that since he was not a member of the ARB, that there was no reason for her to talk to him or to provide information. When was it filed? What was the date? I'm sorry? When was suit filed? Suit was filed on October 13, 2010. But isn't there some communication from the board after this August 26, 2010 letter? The communication was through Mr. Bennett. The board asked Mr. Bennett to contact Mrs. Scoggins. I thought there was some written communication. No written communication regarding the ATV. The process that the board had followed in years past in addressing a variety of issues with the Scoggins was to have Mr. Bennett be the liaison because he had a relationship with them. So they simply followed that same pattern, asked him to follow up and actually to go to their home and meet with them to obtain the information necessary. What's required to get the board to come out with definitive responses? What's required with respect to the ramp is set out in the October 18, 2010 letter. With the ATV, what they were asking for is what is the type of ATV? They've got that, right? Has it been, well, the Scoggins representative had been specially adapted, so they wanted to know is there some special adaptation with respect to this ATV? What is exactly? I thought it was your position no one could use ATVs on the roads. No one can, but at this point in time, the board... People are in your community, right? No, they are not. Nobody in the community is using an ATV. Not on the, to our knowledge, not on the roads. They certainly do not have permission. Your people testified to that. I thought it was agreed that some people were using them. The only mention of that had to do with maintenance workers who come out every so often to do work with respect to the roads of the community. Are they people? They are people, but they are not... Who are using ATVs on the roads of the neighborhood? No, ma'am. They're using what are called gators, which is a different device. And there is no evidence in the record of where they use them, but it's infrequent. And our understanding is it was on the side of the road to facilitate their maintenance of the roads of Lee's Crossing. But there's no evidence in the record that any member has ever used an ATV on the roads. Why are you then insisting on having information about how his is adapted? Because you don't care. You have a blanket ruling. Well, understand at this point in time, the board was taking this issue up for the first time. They didn't know, for example, that there was... I thought they had it back in 09. You know, it's... Right, but considering it... Both the board's process and this record are sort of similar. It's a lot of confusion, and it looks like there isn't anything focused going forward. I know the board's a voluntary organization, and these are people, but they have a serious request here before them. One is to approve that ramp. Now, apparently, it's on the Scoggins to get some information, and that sounds reasonable to me based on what the application looks like. But the ATV, what's holding you up? What they were trying to do, Your Honor, before they made a decision, was to gather as much information as they could. This is a volunteer board. They weren't aware that the state of Virginia had a law prohibiting ATVs. They had not read the manufacturer's information saying that we sternly warn against using it on the roads. They were trying to gather information to make the best decision that they could. Well, this is... What year are we in now? 13. Have they responded yet? Have they stopped with the lawsuit? With the lawsuit, the response really was in responding to this lawsuit. So they've stopped working on this because the lawsuit's pending? What they've concluded, once they've reviewed and hired an expert on ATV safety and were made aware of the statute in Virginia, reviewed the Honda manufacturer's literature, that it is not a safe request. Why didn't the board tell the Scoggins that? Because they filed a lawsuit before that could be done. What's wrong with the lawsuit? That doesn't stop them. They still live in the community and they still ask for the accommodation. You can turn it down if that's what you want to do. Well, in the view of the board, the lawsuit preempted that normal process and then the response was within the context of the litigation. And clearly the response in the context of the litigation is this is not a safe activity. And that's the reason for its denial. Can you make any representation to us about what the board would do, is going to do on both of these issues? If the information provided by the ramp is given, the ramp would be approved. The ATV would not be approved because it's just not safe. Sounds to me like you guys ought to be able to go out in the hall and work this out. We have tried, Your Honor. But the Scoggins refused to participate in the process. They've taken the position that they are not required to provide the information with respect to the ramp. And in the context of trying to resolve even this appeal, that was the holdup. They refused to go through the process. If they had done that, and it's been two and a half years now, the ramp would have been approved. Mr. Merritt said as much in one of the declarations filed with the district court. This is simply a board trying to follow its covenants. Same covenants that the Scoggins had complied with numerous times before. Or assertedly violated, according to the board, numerous times before. And I think that's conceded. When you're recounting history, you've got to fairly recount it. I understand. There's no question there were issues with the Scoggins in the past. But those have all been resolved. They've been unfairly treated by the board. What's that? They believe that they have been unfairly treated by the board. And the information in the record demonstrates that there were letters from the Scoggins apologizing to the board for numerous violations. But whatever those issues were, the board was able to work through them by interacting with them and exchanging information. The board would have done the same thing here. Mr. Merritt and his wife were two people on a five-member board. If they had provided this information, the board members were all in agreement that they would have approved this ramp. But there's a certain policy, a certain procedure, that the board feels compelled to follow. So if that had been done, then yes, that would have been granted. Thank you. Mr. Ferguson. Do the Scoggins intend to stand on their application as submitted, or are they prepared to supply the information requested? I think they would supply the information requested. Why haven't you done that since the letter was requested? Your Honor, we've been involved in this litigation. No, I said that doesn't stop you from sending the information, does it? Oh, I'm sorry. I misunderstood Your Honor's question. They sent a letter ticking off a bunch of things they needed. Correct. And you said you're prepared to supply that. Why hasn't that been supplied? Well, at that time, that wasn't the feeling. And the reason... What do you mean, the feeling? They asked for something and they said, we're not denying it, we need this information. And you said you're prepared to give it, so why not give it? If I can respond this way, Your Honor, is that at that point, the Scoggins believed that they were just going to get the same delay as they've received in the past. Well, then I gather you're not prepared to submit it. At that time, we weren't. At that time, we weren't. Well, then it seems to me at this point, you're asking us to rule on the record as it sits and say whether the board was justified in taking no further action because you didn't respond. Well, I mean, that's really what you're saying. At that time, they were not intent on supplying anything further and the board didn't get anything further. And so it's not just simply an incomplete application, it's an incomplete application in which the Scoggins are intending to stand on it. Well, Your Honor, they received some comments from... I just want to know if that's factually correct. They intend to stand on that application. I believe they do. All right. I believe they do, Your Honor. There was some indication about comments that came from neighbors about the particular board meeting that was just being discussed. And I want to point out that these comments that came from neighbors, the Scoggins learned about the September board meeting well after it occurred. And the feedback that they were receiving from neighbors that came in incrementally was that the merits were opposed to the request, the request was close to being denied, and they decided to take... Which request? The request for the ATV. Well, they're going to deny it. Right. I mean, it sounds to me like from their point of view, the ATV is not appropriate, it's not reasonable. You may be able to make a case it's necessary for certain aspects, but their view is it's not reasonable because of the safety and the laws and the 35 mile per hour speed limit and this type of thing. Well, I would submit that's a rather hypocritical view because I do recall in the record, there is testimony from Mr. Bennett that his own kids use ATVs. I thought there was testimony in the record that other people were using ATVs. That's correct. But your colleague says that there isn't. And since you guys, neither one of you want to tell us where anything in the record is. Where is that in the record? I don't have the reference to the record. It's in John Bennett's deposition. Is the whole deposition in the record? Yes, Your Honor, it is. And if I may move on to the, it would be the August 26, 2010 request for the ramp and then John Bennett's response. John Bennett's response was received as being totally disingenuous because there is commentary that's going back and forth where the so-called liaison person who was assigned to help the Scoggins address earlier covenant violations that occurred years before, he was the person that was supposedly assigned to go visit with the Scoggins after the September 2009 board meeting and he's the liaison. And now he's responding to these emails. What's the nature of your son's disability again? Who is your son? What kind of ATV? It came across so totally disingenuous for somebody who's so involved in the process and nowhere mentioned in that email is any comment about, Mrs. Scoggins, I tried months ago to reach out to you. I drove by your house on this particular date. I sent you an email on this date. Nothing at all. And you would think that in a communication like that, had they really followed up after the September board meeting and gone to visit with the Scoggins, that there would have been a comment like that. But there was nothing at all. It was almost like radio silence toward that issue. And a question of what's the nature of your son's disability again? And so I think it's pretty reasonable that someone could interpret something like that to mean, here we go again. I'm getting the runaround again. And that's what prompted the August 26, 2010 email. I'm not sure at this point, your honor, about what their concerns are. But again, the state of Virginia only speaks to the use of ATVs on public roads. And I just want to emphasize, these are private roads. They're private roads, but they have the speed limit of 35 miles per hour. Cars are driving on it. And they're not designed for use on roads like that. And the same risks that are posed on public roads where the speed limit is 35 would presumably exist on these private roads where the speed limit is 35. Well, I believe, your honor, that it presents a safer alternative than anything else anybody else has come up with. And there was never any objection to him taking to the roads in a manual wheelchair and a certainly a lot more dangerous. At least an ATV has a comparable speed to an automobile. At least an ATV places someone up in a position where they're more easily seen. I understand you're arguing now for why they didn't oppose a bicycle or a tricycle or something else on the roads where it's not an issue in this case. I would respectfully submit if somebody said, I want to use wheelchairs on the public roads, the state of Virginia wouldn't approve it. And I would say the same thing that on the private roads it wouldn't be approved either. But that's not before us. And to argue that seems to me doesn't advance the ball. I think the issue in this case is we have two requests for accommodation. We have the ATV, which from all indications in this record and from the state's counsel are going to be denied for safety reasons if they haven't been denied. And the ramp, which they say might be approved, you're skeptical about it. But the record leaves it at they've requested information and you've taken the position you're not going to submit it. And so it seems to me you're leaving us with only the choice to rule on the record as it is whether the board was justified in requesting the information. Because otherwise, it seems to me the ramp would be a done deal by now. Correct, your honor. I don't know if I've done what I'm supposed to do procedurally, but I don't know whether I was supposed to reserve rebuttal time for their appeal or not or whether I'm completely out of time. They didn't talk about their appeal. I'm sorry? They haven't talked about it. Do you think they're going to get some time, extra time now? This is my first oral argument. I must admit, and I'm... What's your point that you want to make? I know they have an appeal on the fees issue, and I just want to make sure I reserve enough time for that. And I didn't know whether... No, they didn't argue it. Is there something you wanted to say? No, there isn't at this point, your honor. We do have your briefs, and I must say it's not a straightforward issue. There's a contractual claim on the one hand, and there's a public policy involving the Fair Housing Act claim, and the district court worked under the Fair Housing Act and denied attorneys fees, and I gather you support that ruling? I do support that ruling, your honor, and it's a fair housing claim, and the public policy considerations outweigh the contractual issue, and it's... Then there comes the great issue of what if you and I get together and say, we recognize that the Fair Housing Act has apportioned attorneys fees in the fashion that the law has done so, but why don't you and I agree that in connection with any fair housing claim, we'll each bear our own expenses? Could we do that? And maybe you can't. I don't know, but that's what makes it... I think it's clearly a violation of the public policy that Congress has intended. Thank you. Thank you, your honor. We'll come down and greet counsel and then proceed on to the next case. Thank you.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Barbara Milano Keenan